Kirkpatrick. And so we'll move to the first argued case for today. Numbers 2030 and 2074, United States versus Gershman. Mr. Urowitz. May I proceed? Yes, go ahead. May it please the court. With the court's permission, I'd like to focus on probably the most contentious issue at trial, and likely why there was a trial in the first place, and that is the arson. Appellant's arson conviction was problematic at every level. The sufficiency of the evidence, the court's instructions, and the government's arguments to the jury. With respect to the sufficiency of the evidence, the evidence that Gershman's participation in an arson conspiracy was at best for the government razor thin. According to Yusufov, when the plan was mentioned, Gershman was one of the people who shook his head  Gershman didn't suggest it, he didn't ask how or who would do it, he didn't send them off, and he wasn't there to welcome them. And according to Barth, the other government cooperating witness, there wasn't even a meeting at all in which Gershman shook his head. So as the jury was instructed, mere knowledge or even acquiescence without participation is insufficient. You have to have the defendant engaged, advised, persisted. None of that was present with respect to Mr. Gershman. So we start with an extremely weak case as to the arson. And recognizing the weakness of the evidence as the arson conspiracy, it's for this reason that the government sought to bolster its case with a Pinkerton instruction. But it wasn't an ordinary Pinkerton instruction, one that would naturally suggest, meaning you have an arson conspiracy, and as a result of that, you could infer the substance of arson. The government threw into the mix the gambling conspiracy. And in this case, a gambling conspiracy that was essentially conceded. But arson is not a reasonably foreseeable outcome of a gambling conspiracy. The government seems to suggest that because of- Well, the jury found him guilty of the arson conspiracy. So even if this instruction were erroneous, doesn't everything hinge on the point you just made about whether the evidence was sufficient for the arson conspiracy? And as I mentioned before, I don't believe that the arson was- that the evidence was sufficient. But as I mentioned in my brief, there were several additional problems why they may have convicted of the arson conspiracy. First of all, there's the inverse Pinkerton problem addressed in this court's decision in Sperling, whereas where you have evidence of the substance of acts, in this case, the gambling and everything that was associated. And the jury uses that to infer the participation in the underlying conspiracy. That's what this court questioned in Sperling. But moreover, I think the government compounded it when they described the elements of reasonable, foreseeable with a hypothetical that I think is just totally confusing to the jury in this case. The government kind of dumbed it down to a level that just eviscerates the elements of Pinkerton. And the government seems to suggest that here it was appropriate to add in gambling because this gambling conspiracy evolved. And that after the meeting, in the words of the government in their brief at 73, at this point in the illegal gambling conspiracy, it was reasonably foreseeable. But the instruction to the jury was not so limited. It permitted conviction based on the gambling conspiracy, even if there was no meeting. Indeed, that's the way the government argued it to the jury. At 1977, for the record, the government said if the arson was reasonably foreseeable of the conspiracy to gamble illegally, no mention of protecting the gambling enterprise or anything like that. So you have a case where the evidence is weak, the government just out of the blue sticks in the gambling conspiracy, and it wasn't necessary. If the government's theory was there was a meeting, the instruction allowing the conviction based on only the arson conspiracy would have been sufficient. And I think, as I mentioned before, the government compounds it by describing the reasonably foreseeable in a wholly inadequate way. This pizza analogy where your friends go out, you say Chinese, they say pizza. The question is, would you be responsible to pay for the pizza afterwards? Would you be responsible if they get sick for it? The government just kind of just took one element of Pinkerton and reasonable foreseeable and just made it in a way that a jury could just find, oh, he committed gambling. He was part of the gambling conspiracy. Necessarily, he must have been guilty of the underlying arson. And I think, in this case, it was just error to instruct the jury and a reversible error at that. OK. If the court has no questions. Unless there are further questions, Mr. Ewertz, you reserve one minute for rebuttal. So we'll hear from you again, Mr. Singer. Sure. May it please the court, good morning. My name is Murray Singer. I represent appellant Alexei Svetkov. I will join in my counsel's arguments with regard to the both sufficiency and the Pinkerton issue with regard to the arson and arson conspiracy. I would like to focus my remarks this morning to the court on points one and two of my brief addressing the sufficiency of the evidence to support the enterprise element of both the racketeering charge and the racketeering charges that are related to the gambling conspiracy. In a series of cases, starting with the Supreme Court and Tartet, the Supreme Court and this court have found that an enterprise, which is an essential element for either of the first two counts, the racketeering charge, that an enterprise must be an ongoing organization that exists separate and apart from the series of criminal acts. The racketeering count here stretches from 2011 to 2017. It's a seven-year period. Mr. Svetkov is charged in the first count in seven of the 16 racketeering acts. So he's charged with seven racketeering acts over a seven-year period. And the government argues from that that there was an ongoing organization. Now, particularly with a collection of credit racketeering charges. But the government doesn't argue from the acts that there was an ongoing organization. Isn't that just a requirement of the charge that there be an enterprise? So it is a requirement. It's not simply because they took individual acts. It's because they argued that there was evidence that there was an enterprise. And we disagree with that. I think the concern was expressed by Judge Hogan at the end of the evidence, where he addressed the government and said that this was not a grand conspiracy. It's a series of people. The government's idea of the purpose of the, I've got a mask. It's hard to tell who's talking. Yes. I'm sorry. But the government's claim is that the purpose of this enterprise is to make money. So the government proved, did it not, that there was some sharing of profits? As an organization or as an enterprise? No. There is no evidence of that. What would happen is in sharing. Was there sharing of any profits among the members of this putative enterprise? If, in the context of these individual criminal acts, yes, if you and I could, if you asked me to assist you in collecting the debt, and I assisted you and collected the debt, then you and I would share in the money that was collected. But there was no central pot from which people were drawing. No, no evidence. No evidence of a central pot. Essentially, it is if I was doing something for you or anyone else, and then when I was asked in an individual circumstance, I'd essentially get paid for my work. You make it sound like a tip. Well, it's not a tip. It's payment for my services, in essence. If I'm assisting you to do some particular act and we collect money from it, yes, I should. It's the argument that it's ad hoc with respect to individual crimes, rather than a sharing of profits from some identifiable pot of money generated by a group. That is clear from the evidence. The testimony as it came out. If you're somebody that is always called upon to help collect debts that always arise, could a jury not conclude that that was an ongoing relationship? The debts were not from an ongoing series of incidents. It was individual incidents. I mean, there were a number of people that are accused of being part of this enterprise. But if one person had a gambling debt that was owed, they might ask me to come and help collect that debt. It had nothing to do with anybody else. And on another date, a year later, two years later, I might be asked by somebody else, I've got a debt from some theft. Somebody stole something from me. Can you help me come collect it? The evidence shows that it was a series of ad hoc events. It was not one grand conspiracy. These are people that are from the same culture, that lived in the same area, that were committing similar types of crimes. But there was no organization. There was no central pot of money. Who called it the syndicate? The government. Nobody called it the syndicate. The government called it the syndicate. There weren't any witnesses that called it the syndicate. It was the government's terminology that they put into the indictment that they used throughout the course of the trial. But it was certainly not part of the testimony of any of the individuals. So we have said that an enterprise under RICO doesn't need to have any particular hierarchy or a chain of command and so on. And so if there are a bunch of people who get together for similar purposes on a repeating basis, why can't that be an enterprise? And how are you different from that sort of an enterprise that we have said is a permissible RICO charge? Judge, these cases are necessarily fact-based. As I was putting my thoughts together for this argument. That's what I'm saying. So what you're describing is, well, there are people who get together on an ad hoc basis and they're just doing the same kind of thing over and over again, but it's not an ongoing enterprise. Now we've said that you don't need a hierarchical structure or chain of command so you could have people who get together and do a similar thing over and over again and you could call that an enterprise. And so if that could be an enterprise, then what is it about your case that shows that it absolutely cannot be? They're not all acting together in the same businesses. There might be two or three people that are engaged in selling marijuana over here. There might be a couple of other people a year or two later that are involved in gambling. There might be somebody else who had something stolen out of their home and they wanted to recover that or get it paid back. And it was different pockets of individuals. It was two guys here or two guys there or two guys there. So I understand that there isn't a mathematical formula to determine what is legally sufficient. It requires an overall view of the people and the events and it's something that the courts do on a regular basis. I see that my time is up. I will simply urge the court to do that rigorous analysis here to determine whether that minimal threshold has been met. We contend it is not. Judge Kogan certainly had concerns about it at the trial and I think those concerns were well found. Thank you, Mr. Singer. Thank you very much, Your Honor. Mr. Trowell. Thank you, Your Honor. May it please the court, Kevin Trowell for the United States. It might make sense to just start in the reverse order. So we're starting with the one that is freshest on the court's mind with respect to the enterprise element. One obvious point, I think, is the standard and the posture here, which is post-verdict, obviously drawing all inferences in favor of the government. I think with that standard or without, but certainly with that standard, we are looking at a group of individuals associated in fact who come to each other with business, share resources. There's a hierarchy, as Your Honor pointed out, Judge Menasche, the court has not required a hierarchy, but here there is one. And so certainly we've gone in certain respects. But the hierarchy you described sometimes had some people on top and then sometimes they switched again. And I don't know, I come from a law firm and we didn't do that. That's not true, Your Honor, actually. So the point that Mr. Gershman makes in his reply is based on a sentence in the closing. While that sentence was being uttered by the AUSA, this slide was on the screen. And at the top, as throughout the trial, you have Mr. Tretzkoff, Mr. Zellinger, and Mr. Gershman. If you look at the government's sentencing submission, there's an entire section saying that Mr. Gershman is a leader of the enterprise. If you read the sentencing transcript over and over again, the government says, Mr. Gershman is not a leader. In fact, he is the face of the enterprise. But of course, the district court just decided that his actions were consistent with those of a soldier and not a leader, right? And so therefore, the district court thought he was not a leader of the enterprise. Well, he said that, but in a way that actually, as I read, I wasn't present for the sentencing, I didn't handle the case below, but as I read the transcript, you could read it and think that the judge had found a leadership enhancement. He said, what Mr. Gershman did was, if something had to get done, he would direct somebody to go and do that thing. That is, I mean, that is, in some sense, the definition of leadership in this context. He went on to say, in his view, it was not the overall planning and specializing. He said, maybe it's my view that the guidelines are more geared toward traditional organized crime. He viewed this as nontraditional organized crime, which is not unfair. And he viewed the leadership, the description of the leadership enterprise as applying more to, say, a capo or a consigliere or a traditional OC role, which this clearly was not. But I think to the point of the leadership structure changing, that's absolutely untrue. I think what happened in the transcript is, perhaps an awkward syntax and misplaced punctuation. That was never, at any point, the government's theory. The purpose of the enterprise, first of all, the government named the enterprise, the syndicate, right? Correct, and that, well, I wouldn't say we named it. We gave it a reference so that it could be referred to. It's in the indictment, and the government does that on occasion, for example, where there's a gang that's based on a street. They might call it the Such-and-Such Street Enterprise, really for convenience, so that it can be referred to in the course of the trial. But there was no name. What's the basis for assuming the profits were shared? Well, I think the basis for that is, it's not profit. You're absolutely right that there wasn't a pool. I think it would be the rare case. So there wasn't a pool. Right, and it would be the rare case where there was a pool. Where did the money go that supports the idea that profits were shared, without which, as far as I'm concerned, I don't see any enterprise. I mean, what's the purpose of the enterprise? It's not to get together socially. It's to make money and share it. Well, I think there are a few things. First of all, you have, at the core of the enterprise, the gambling conspiracy, which essentially involves all of them. They conspire to run the gambling spot. They, in fact, run it. They agree to extort those whose debts come out of the gambling spot, and they, in fact, then collect those debts. Do they share the, does the gambling spot produce profits on a corporate level that then gets shared according to some formula? Yes, and you can see in the transcript, for example, places where, I'm sure I'm gonna get the percentages wrong, but where a particular, I think it's either Yusufov or Malkaev say they own 12.5% of the gambling spot. There's an actual division of the ownership and the profits that flow from it by, in a very corporate sense. So at some point, again, I don't wanna get the, it's possible I'm gonna get the names wrong, but the leadership forces some lower down in the gambling conspiracy to sell a part of their stake. I think it may be to Mr. Zellinger, but I believe it's in Mr. Yusuvov's testimony. He's forced to give up a share of his ownership in the gambling spot to a higher ranking person, and that's done in sort of a corporate sense. I'm cutting your share in half and I'm giving it to that new person. Now, from that gambling conspiracy, you also have the marijuana conspiracy, which involves almost all of the enterprise members, and then you also have- Yeah, but I understand that it can involve a whole bunch of people. The question is, are they sharing their individual profits? They are, and there's a partner, they refer to it as a partnership in the marijuana business. They have employees that they're paying, so the drug runners are being paid weekly. In the gambling enterprise, they're sharing by this percentage mechanism. And then throughout, there's evidence of not only sort of sharing of profits in a corporate sense, as Your Honor put it, but as Mr. Yusufov put it, we all ate. We all made sure we all ate. So when there was a job that someone had, the Kutovnikov extortion, for example, Mr. Yusufov was paid for that. He wasn't involved in the sense that he did not actually go and threaten Mr. Kutovnikov, but Mr. Gershman gave him money for that. A thousand dollars. A thousand dollars. Similarly, Mr. Bobritsky brought the Denis Dulevsky extortion to Mr. Gershman. So there was a lot of that as well, where it's like, within the enterprise, there are specializations. There's the gambling guys. There's the extortion guys. There's the drug dealing guys. No, but you see, if you say that within the enterprise, there's specialization, you could take that grammatically and turn it around and say that there's no enterprise, because what you have is a whole bunch of people specializing and doing different things. But I think, respectfully, Your Honor, that's true in virtually every enterprise. And that's certainly true in traditional organized crime, where not every member is involved in every crime. Not every member even needs to know of every other conspirator, much less every other crime. What we're talking about is not a situation where everyone has to have full exposure or full picture. We have a hierarchy. We have a clear rank system, where you have people below purchasing gifts for those above, running errands. Well, in principle, could there be a situation where some people are acting essentially as contractors, where they come in as an ad hoc basis to do a particular task, but they're not really part of an enterprise? It's conceivable. I don't think that that's necessarily, that's not what we have here. And I think it's not inconsistent with the concept of an enterprise, for that matter. The enterprise is an association in fact. It's not, it doesn't require a formal structure. It doesn't require hierarchy. It requires individuals who are associated in fact, which is- Really, so if I have an enterprise or some kind of a, I mean, if I have some kind of an operation and there's some driver that I hire routinely to drive me different places for business, but like he's just for hire on an ad hoc basis, that person would be part of the enterprise? I don't know. It depends. Does he know, to what end is he hired? Is he hired because he knows he's driving you to shootings in furtherance of the enterprise? Perhaps. Is he a person who's been hired to drive you to the supermarket? Probably not. But I think it's a question that, for a properly instructed jury, is for them to decide. And here, there's no question that the instruction was correct. We're not talking about that. What we're talking about is a hotly contested issue at trial, a properly instructed jury, and arguments made that the jury simply rejected. And so here, for the court- And so, can I ask just a question about the, just to move to the Pinkerton question. So the jury found that they were guilty of arson conspiracy, right? That's right. So even if the Pinkerton charge was erroneous, it doesn't, it would be harmless because there was a finding of guilt on the- You mean with respect to the gambling conspiracy? Because I think, so, I don't think there's any question that the, I think they can, I think the defendants can see that if the arson conspiracy existed, the Pinkerton instruction was appropriate, and they lose. So if the court finds the evidence sufficient on the arson conspiracy, we don't really have an issue. And I think that's why my adversary keeps referring to the gambling conspiracy because he's hoping that has some legs as a separate, as an issue separate and apart from that. Respectfully, I don't think it does for the reason that Your Honor's identified. Well, I think he's saying that the jury could have seen the gambling conspiracy and then found them guilty of the arson by virtue of the fact that they were conspiring for gambling, and that would be inappropriate. And I think Your Honor's point is directly on point to that argument, which is, in a different universe where there had been acquittals, possibly we'd be here having an argument about that point. If there had been an acquittal on the arson conspiracy, and so therefore, potentially that meant the jury didn't credit the testimony of Mr. Yusufov. Of course, there's case law that says a jury can acquit of a conspiracy and convict of a substantive offense, but given the way it was charged, we might be here having a different argument. We're just not having it because the jury obviously credited the testimony of Mr. Yusufov in another hotly contested issue where the government, the reply brief makes a great deal of the testimony of Mr. Malkaev, who was a government witness, who the government didn't shy away from, who the government closed and rebutted on the consistencies between their testimony. There are inconsistencies, but that's true in many, many cases. And here- Can I ask you just before your time runs out about the double jeopardy argument? Sure. So you charge in count three this overall conspiracy to collect extortionate debts, and then those subsequent counts are all different instances of collecting extortionate debts. Now, aren't those just part of the overall conspiracy that you charge in count three? No, and here's why. So my adversary in his reply brief takes issue with our description of his argument, and he's insisting that it's merger and not multiplicity. I think the reason for that is because merger is a doctrine of law. So in a case where you have an offense and a lesser included, by operation of law, those two, or there are some limited other circumstances, for example, certain money laundering offenses where the conspiracy and the substantive offense merge by operation of law. There's no question in those cases that the charges are correct, that factually the elements are met, but merger happens as a matter of law. Here, what he's arguing is that the government charged the same agreement, but spread out over a number of conspiracies. The only way to know whether that's true is to ask the jury, because the question of whether the conspiracy charged is one or more than one is a factual question for them to resolve, and that's exactly what this court said in Jones, which we cite at length in our brief. So really, if he thought that it was overlapping, an overlapping conspiracy, he should have asked for an instruction and maybe a special verdict or something to separate out. There's no question, because what he's asking this court to do now, having- But you see how it's possible that the jury could have thought, well, if they did the individual conspiracies to extort debts from these individual people, then if so facto, they'd be guilty of the overall conspiracy to collect extortionate debts. I guess a different way to look at this, though, Your Honor, is if we had charged only the top, the broad conspiracy, and then attempted to hold all the co-conspirators responsible under Pinkerton for all the substantive acts, we'd be here having a different argument. I'm sure they wouldn't be happy with that. The way it's charged is, in the government's view, I think this is borne out by the facts, and we don't know what the jury would have done because he didn't ask, but the objects of the conspiracies are different, because the object of the broad conspiracy is to collect in connection with the gambling conspiracy, and so there, you're giving comfort to your partners in the gambling conspiracy that you're gonna go get the money wherever it may be, and that happens at a point in time. It extends throughout the course of the gambling conspiracy, but the object is tied very specifically to the gambling conspiracy and how the members understand it. The individual extortions are different. One of them has nothing to do with gambling. That's Dennis Gillespie. But with the exception of that one, which is Dulevsky, right, all the other ones are gambling debts. Yes, but they involve different participants. They involve, one of them, Shlomi, involves members of other crews. It involves thieves in Russia and in Israel, so it's entirely conceivable that a properly instructive jury might have agreed. I don't know. It seems unlikely to me, but we can't know because he didn't ask for the jury instruction. All right, so you're saying basically it is conceivable that the individual conspiracies could have been duplicative of the overall conspiracy. A jury could have seen it that way, but they could have also convicted only on what is overall and not the specific or vice versa, and it's the defendant's fault for not asking for a clarifying instruction or a special verdict or something. And that's exactly what the court said in Jones. And I mean, the government's view, as we laid out in the brief, is that these are not the same, but his question is, his insistence is that they are, and the government's view is, we just don't know because he never asked for it, and so the court is not in a position now to act as a fact finder and say, you're right, we're gonna reverse the verdict on one of these. Just one last point on that. The only case he cites in his reply also does not support the relief he seeks on that because all the court did in the one case in his reply was send it back because the sentences like here were concurrent and basically say, we're giving this $100 special assessment back. This is not a case where there's a sentencing knock that needs to be untied. The sentences were concurrent, and even if he's right, it's a matter of an administrative matter at most. Okay, thank you very much, Mr. Trowell. Thank you. We'll hear again from Mr. Urowitz. Just to focus on the Pinkerton and Your Honor's question about whether the error was harmless, the answer is no, the error was not harmless in this case. First of all, because one, the evidence was truly insufficient as to Gershman on an arson conspiracy. Two, as I mentioned before, you have the whole problem. This is the Sperling problem. This is what the court cautioned about in Sperling about where you have, where the jury is inferring the conspiracy from the underlying acts that are there, particularly the gambling conspiracy that the court threw in and everything that accompanied it along with the substantive arson. And finally, just the instruction itself, whether it was reasonable or foreseeable. That, I think, just gets to add to the mix. As far as the question, this is not the merger question. This is not a question, this is, Gershman could have moved on duplicity grounds to dismiss one or the other, and the fact that he didn't doesn't mean that there's no merger issue, right? The reality is, if you look at the indictment, it's very clear, count three alleges an overall conspiracy, and all the other- Well, count three starts in 2015 and extends to 2016. The specific ones only happen in 2016. Most of the specific counts are only Gershman and not the other- That's exactly the point. That's exactly the point. All the other ones are subsumed within the overarching conspiracy. That's where the merger issue comes from. But they could be, and I think that the government was recognizing that you could imagine it that way, but you could also imagine the jury thinking, well, there was an agreement to have an overall conspiracy to collect extortionate debts, say that happened in 2015, but the government hadn't proven that any of these individual conspiracies had actually occurred. So it's possible that they could have been separate conspiracies. And we have said, you could, if it looks like they could overlap or there could be a double jeopardy problem, you could ask for special instructions or a special verdict or clarification, right? That's no question about it. I think that what you're on is saying, yes, it could be that the jury could find him guilty of, for example, or not found him guilty of the overall conspiracy because they didn't find this overarching conspiracy, but still convicted of the lesser one. But the reality is having convicted of both, everything that's in the lesser ones is subsumed within the larger conspiracy. And that's precisely the issue of merger. In Marina Montenegro, it wasn't even, you talk about no objection. I was counsel in that case. It was plain error. But the point is the court just looked at the indictment and said plainly, these conspiracies. You know, I understand, but sometimes there's a question as to whether it really is assumed and we apply the, what is the core fan factors as to whether it's one overall conspiracy or some individual conspiracies. And you never raised the issues and the district court never had to address this question about whether that properly was considered one overall conspiracy or individual conspiracy. So why should we vacate the convictions after the fact if you could have raised that before the district court? Respectfully, I think, Your Honor, there's a difference between the multiplicity issue of whether they could be submitted to the jury and the merger issue, whether now having the jury convicted, whether he could be punished separately for all of that. We're under- You're saying it couldn't even be submitted to the jury? I'm sorry? It couldn't even be submitted to the jury? No, that would require- I would have thought that the double jeopardy problem arose when you had multiple convictions for the same conduct, not- That's my point. My point is, at a multiplicity level, that would be the argument would be, should this be submitted to the jury? That's not an- I was in counsel in the district court, but the counsel never raised that issue. There's a whole separate question. Even if it was submitted to the jury, whether multiple punishments could be imposed on that, and that's where the merger issue comes, and the law is clear in the circuit that multiple punishments can't be imposed on that. That's it. Okay, I think we have that argument. Thank you very much. Mr. Urowitz, the case is submitted.